# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**LYTTON RANCHERIA OF CALIFORNIA**,

    1500 Falling Oak Way
    Windsor, CA 95492;

        *Plaintiff*,

   v.

**UNITED STATES DEPARTMENT OF THE INTERIOR**,

**UNITED STATES BUREAU OF INDIAN AFFAIRS**,

**DOUGLAS J. BURGUM**, in his official capacity as Secretary of the U.S. Department of the Interior,

**SCOTT DAVIS**, in his official capacity as acting Assistant Secretary for Indian Affairs, U.S. Department of the Interior,

**BRYAN MERCIER**, in his official capacity as Director of the U.S. Bureau of Indian Affairs,

**PHILIP BRISTOL**, in his official capacity as acting Director of the Office of Indian Gaming, U.S. Department of the Interior,

    1849 C Street, NW
    Washington, DC 20240,

and

**AMY DUTSCHKE**, in her official capacity as Regional Director, Pacific Region, of the U.S. Bureau of Indian Affairs,

    2800 Cottage Way, Ste. W-2820
    Sacramento, CA 95825;

        *Defendants*.

Civil Action No.

**COMPLAINT**   25-1088

Plaintiff Lytton Rancheria of California ("Lytton"), by this Complaint, alleges as follows:

## INTRODUCTION

1.      This action seeks to remedy the unlawful actions of the U.S. Department of the Interior ("DOI"), Bureau of Indian Affairs ("BIA"), and their officers in rushing to take land into trust and then to approve a casino project proposed by the Scotts Valley Band of Pomo Indians ("Scotts Valley")—all of which would irreparably harm Lytton.

2.      DOI, BIA, and the other Defendants (as defined below) ignored statutory and regulatory requirements and brushed off serious concerns voiced by state and local officials and tribes in order to rush through approval of a large tribal casino in the San Francisco Bay area just days before the end of the Biden administration. That eleventh-hour decision runs contrary to earlier BIA decisions rejecting the tribe's attempts to build casinos in the Bay, which is nowhere near its historic homeland or current headquarters. Worse still, the casino will dramatically impact the operations of a nearby casino operated by Plaintiff Lytton, which employs over 500 people and generates 65% of the City of San Pablo's operating revenue. Yet BIA ignored the obvious detrimental impact its about-face will have on Lytton, its citizens, and the surrounding community, and bulldozed ahead in violation of various federal statutes governing these projects.

3.      Indeed, this casino project is just one of several gaming projects that Defendants hurried to approve before the end of the Biden administration. In a hearing in late December 2024 addressing a similarly rushed casino project, the government opposed a temporary restraining order because DOI "want[ed] to take the land into trust *before the next administration*."[1] And that is exactly what Defendants did: the ultimate approval transferring land for the casino project was

---

[1]      *See* Transcript of Proceedings, ECF No. 40-1, *Federated Indians of Graton Rancheria v. Haaland*, No. 3:24-cv-08582-RFL (Dec. 20, 2024) at 12:6-13 (emphasis added).

issued just days before the end of the Biden administration. In rushing through these approvals, Defendants railroaded other Indian tribes, including Lytton, by failing to follow regulatory requirements or conduct necessary consultations, treating Scotts Valley preferentially compared to other similarly-situated tribes, and conducting a woefully inadequate environmental review.

4.    Defendants' actions departed from decades of precedent and practice that carefully scrutinized the connections between Indian tribes and the land upon which they wished to build gaming facilities. If upheld, the effects of Defendants' actions will be enormous: they set a precedent for green-lighting casinos in virtually any location throughout the United States, no matter how tenuous a tribe's connection to the proposed site may be.

5.    Indeed, in March 2025, DOI "temporarily rescinded" the prior Administration's determination that the land was eligible for a gaming facility—based on the Secretary's "broad authority to review and reconsider any decision of [DOI]"—and invited interested parties to submit relevant information by May 30, 2025.[2]

6.    Though it lacks any significant historical connection to the area, Scotts Valley seeks to build a casino gaming project (the "Project") on a 160-acre site in the City of Vallejo in Solano County, California (the "Project Site"). To that end, Scotts Valley requested that BIA acquire the Project Site into federal trust status for the benefit of Scotts Valley, and that BIA and other federal agencies approve Scotts Valley's construction of the Project. The approvals include (a) a fee-to-trust transfer pursuant to the Indian Reorganization Act, Indian Gaming Regulatory Act, and related regulations; and (b) environmental approvals of the Project under the National Environmental Policy Act.

---

[2]    Letter dated March 27, 2025, to Hon. Shawn Davis, Chairman, Scotts Valley Bank of Pomo Indians, from Scott J. Davis, Senior Advisor to the Secretary of the Interior, Exercising by delegation the authority of the Assistant Secretary - Indian Affairs (*citing* 43 C.F.R. § 4.5).

7.     In July 2024, BIA issued an Environmental Assessment (the "Draft EA") for the Project. On January 10, 2025, BIA circulated a "Notice of Availability" indicating that BIA had signed a Finding of No Significant Impact ("FONSI") and issued a Final Environmental Assessment ("EA") dated December 2024 for the project. BIA issued an Indian Lands Opinion approving the fee-to-trust transfer (the "2025 ILO") that same day.

8.     That administrative process was critically flawed, both procedurally and substantively. In particular:

a.     When conducting the mandatory environmental review under the National Environmental Policy Act, Defendants relied upon regulations promulgated by the Council of Environmental Quality, but those regulations are *ultra vires*.

b.     Defendants failed to consult affected tribes regarding the Project, and failed to provide meaningful public comment periods commensurate with the length and complexity of the Project, in violation of the National Environmental Policy Act.

c.     Defendants failed to consider the factors required by the implementing regulations of the Indian Reorganization Act when assessing the restored lands application.

d.     Defendants failed to issue an Environmental Impact Statement, and the Environmental Assessments Defendants did issue failed to adequately respond to and consider comments from Lytton regarding various significant impacts.

9.     Moreover, the 2025 ILO made critical errors in applying the so-called "restored lands" exception to the general statutory prohibition against gaming on newly acquired trust lands—particularly because Scotts Valley failed to demonstrate a "significant historical connection" to the Project Site (25 C.F.R. § 292.12(b)) or meet the "temporal connection" requirement (*id.* § 292.12(c)).

10.     Defendants on March 27, 2025, temporarily rescinded their determination that the Project Site is eligible for gaming under the "restored lands," stating that "the Secretary is concerned that [DOI] did not consider additional evidence submitted" after a court decision remanding to DOI a prior determination regarding this site. On April 1, 2025, Scotts Valley filed a lawsuit against DOI, alleging that this temporary rescission was unlawful and seeking to reinstate DOI's prior gaming eligibility determination. *See Scotts Valley Band of Pomo Indians v. Burgum et al.*, Case No. 1:25-cv-00958-TNM (D.D.C.). However, DOI's decision to rescind and reconsider the prior Administration's gaming eligibility determination was entirely lawful—and, in fact, prudent given the various defects underlying the determination.

11.     Due to that temporary rescission, Lytton does not challenge in this Complaint Defendants' application of the "restored lands" exception in the 2025 ILO. However, if Scotts Valley is successful in overturning the March 27, 2025 rescission, or if Defendants otherwise do not permanently rescind their conclusion that the Project Site is eligible for gaming under the "restored lands" exception, Lytton reserves the right to amend its Complaint to challenge this aspect of the 2025 ILO. Nevertheless, that temporary rescission neither rescinds nor corrects Defendants' other unlawful conduct in approving the 2025 ILO, FONSI, and EA.

12.     Accordingly, by this action, Lytton seeks (a) a determination that the legal errors above render the January 10, 2025 decision approving the Project void and invalid, and that the fee-to-trust transfer therefore was never effectuated; (b) alternatively, an order reversing the fee-to-trust transfer until such time, if ever, that Defendants fully comply with law; and (c) the additional relief described below.

## PARTIES

13.     Plaintiff Lytton is a federally-recognized American Indian tribe, among 574 tribes

recognized by BIA.

14.     Defendant DOI is the federal agency statutorily charged with the primary administration of the federal government's trust responsibility to Indian tribes. *See* 25 U.S.C. §§ 2, 9.

15.     Defendant BIA is a federal agency within DOI responsible for delivery of program services to federally recognized tribes and individual Indians, whether directly or through contracts, grants, or compacts. BIA is responsible for evaluating land-to-trust applications, conducting relevant tribal consultations under applicable laws, conducting environmental reviews, and effectuating acquisitions into trust. BIA's program services are administered through various regional offices and agencies across the United States.

16.     Defendant Douglas J. Burgum is the U.S. Secretary of the Interior (the "Secretary") and is sued in his official capacity. The Secretary is responsible for overseeing the implementation of "undertakings" within DOI and its agencies, including BIA, as well as DOI's implementation and compliance with applicable laws. Between 2021 and January 2025, the position of Secretary was held by Deb Haaland.

17.     Defendant Scott Davis is the acting Assistant Secretary for Indian Affairs ("Assistant Secretary"), and he is sued in his official capacity. The Assistant Secretary discharges the duties of the Secretary, including by, *inter alia*, exercising discretion and leadership over BIA and deciding requests for fee-to-trust acquisitions. The Office of the Assistant Secretary includes the Principal Deputy Assistant Secretary – Indian Affairs ("PDAS-IA"). Between 2021 and January 2025, Bryan Newland held the position of Assistant Secretary, and between 2021 and 2024, Wizipan Little Elk Garriott held the position of PDAS-IA.

18.     Defendant Bryan Mercier is the Director of BIA ("BIA Director") and is sued in

his official capacity. The BIA Director is responsible for overseeing BIA's implementation of relevant laws, including the land-to-trust acquisition and environmental review process for gaming projects on reservation sites.

19.     Defendant Amy Dutschke is the Regional Director of the Pacific Region of BIA ("Regional Director"), located in Sacramento, California, and is sued in her official capacity. The Regional Director is responsible for complying with DOI and BIA policy and procedures for fee-to-trust acquisitions, including records management and related responsibilities and processing discretionary off-reservation land-to-trust applications.

20.     Lytton is informed and believes, and on that basis alleges, that Defendant Philip Bristol is the acting Director of the Indian Affairs Office of Indian Gaming ("Gaming Director"), and he is sued in his official capacity. The Gaming Director is responsible for overseeing the development of policies and procedures used to implement the Secretary's responsibilities relating to land acquisition requests from federally recognized tribes for gaming purposes, tribal-state gaming compacts, tribal gaming per capita distribution plans, and gaming-related contracts. Between 2010 and January 2025, the position of Gaming Director was held by Paula Hart.

21.     DOI, BIA, Secretary, Assistant Secretary, BIA Director, Regional Director, and Gaming Director are collectively referred to herein as "Defendants." In undertaking the unlawful approvals issued for the Project (which occurred at the end of the Biden administration), all of these Defendants worked in concert with each other, and as agents of the other Defendants, and thus all such violations are attributable to all Defendants.

## JURISDICTION AND VENUE

22.     This Court has subject-matter jurisdiction over this action pursuant to 5 U.S.C. §§ 701-06, 28 U.S.C. § 1331, 28 U.S.C. § 1346, and 28 U.S.C. § 1362.

23.    Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because officers of the United States are named as Defendants in their official capacities and reside in this judicial district, and a substantial part of the events or omissions giving rise to the claims occurred in this district due to decisions made here by Defendants.

## STATUTORY AND REGULATORY BACKGROUND

### A.    The Indian Reorganization Act

24.    The Indian Reorganization Act ("IRA") permits the Secretary, "in his discretion," to take land into trust on behalf of an Indian tribe "for the purpose of providing land for Indians." 25 U.S.C. § 5108.

25.    The regulations at 25 C.F.R. Part 151 ("Part 151")[3] "set forth the authorities, policies, and procedures governing the acquisition of land by the United States in trust status for . . . Tribes" under the IRA. 25 C.F.R. § 151.1. Under Part 151, as effective at the time of Scotts Valley's application, the Secretary must consider a number of factors when reviewing an application to acquire land in trust when the land is located outside of and non-contiguous to a tribe's reservation, including (in relevant part) the existence of "statutory authority for the acquisition" and any limitations therein, the land's "distance from the boundaries of the tribe's reservation," the "need of the individual Indian . . . tribe for additional land," and "anticipated economic benefits associated with the [land's] proposed use." 25 C.F.R. § 151.11(a)–(c) (1995) (incorporating 25 C.F.R. § 151.10(a)–(b) (1995)).

26.    When the Secretary receives an application from a tribe to take land into trust pursuant to the IRA, state and local governments with regulatory jurisdiction over that land have

---

[3]    Substantial revisions to the Part 151 regulations became effective in January 2024. Scotts Valley and DOI elected to proceed under the prior version of the regulations. Therefore, all citations to Part 151 refer to the pre-2024 version.

an opportunity to provide comment. "[A]s the distance between the tribe's reservation and the land to be acquired increases, the Secretary shall give greater scrutiny to the tribe's justification of anticipated benefits from the acquisition" and "shall give greater weight to the concerns raised" by state and local governments. 25 C.F.R. § 151.11(b) (1995).

      **B.**    **The Indian Gaming Regulatory Act**

27.    The Indian Gaming Regulatory Act ("IGRA") generally prohibits gaming on trust lands acquired after 1988, but provides an exception—known as the "restored lands exception"— where such lands are "taken into trust as part of . . . the restoration of lands for an Indian tribe that is restored to Federal recognition." 28 U.S.C. § 2719(a), (b)(1)(B).

28.    DOI's IGRA regulations provide that to qualify as restored lands, the relevant Indian tribe must, *inter alia*, demonstrate "a temporal connection between the date of the acquisition of the land and the date of the tribe's restoration" and "a significant historical connection to the [restored] land." 25 C.F.R. § 292.12.

29.    For a "temporal connection" to exist, a tribe must show that "(1) [t]he land is included in the tribe's first request for newly acquired lands since the tribe was restored to Federal recognition; or (2) "[t]he tribe submitted an application to take the land into trust within 25 years after the tribe was restored to Federal recognition and the tribe is not gaming on other lands." *Id.* § 292.12.

30.    For a "significant historical connection" to exist, the land must be "located within the boundaries of the tribe's last reservation under a ratified or unratified treaty, or a tribe can demonstrate by historical documentation the existence of the tribe's villages, burial grounds, occupancy or subsistence use in the vicinity of the land." *Id.* § 292.2.

31.    Because the restored lands exception "was not intended to give restored tribes an

open-ended license to game on newly acquired lands," the Secretary "needs to ensure that tribes do not take advantage of the exception to expand gaming operations unduly and to the detriment of other tribes' gaming operations." *Rancheria v. Jewell*, 776 F.3d 706, 711 (9th Cir. 2015).

      **C.**      **The National Environmental Policy Act**

32.      The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, makes environmental protection a part of the mandate of every federal agency, to be considered in conjunction with "economic and technical considerations" to "fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. §§ 4332(B), 4331(a).

33.      NEPA requires that federal agencies take a "hard look" at environmental concerns. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). One of NEPA's primary purposes is to ensure that an agency, "in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* at 350.

34.      NEPA also requires "the relevant information [regarding environmental impacts] will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Id.* Public participation under NEPA serves to improve the agency's process by ensuring that a "larger audience can provide input as necessary to the agency making the relevant decisions." *Department of Transp. v. Public Citizen*, 541 U.S. 752, 758 (2004).

35.      In connection with these mandates, NEPA requires agencies to prepare environmental documents for proposed final agency actions. If the agency action will "significantly" affect "the quality of the human environment," NEPA requires that the agency complete a detailed environmental impact statement ("EIS"). 42 U.S.C. §§ 4332(C), 4336(b). The

EIS must discuss, among other things:

> (i) reasonably foreseeable environmental effects of the proposed agency action;

> (ii) any reasonably foreseeable adverse environmental effects which cannot be avoided should the proposal be implemented;

> (iii) a reasonable range of alternatives to the proposed agency action, including an analysis of any negative environmental impacts of not implementing the proposed agency action in the case of a no action alternative, that are technically and economically feasible, and meet the purpose and need of the proposal;

> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and

> (v) any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented.

42 U.S.C. § 4332(C).

36.     If it is unclear whether the impacts are significant enough to warrant an EIS, the agency may prepare an EA, which contains a preliminary consideration of potential environmental effects. 42 U.S.C. § 4336(b)(2). The EA, although less detailed than an EIS, must "provide sufficient evidence and analysis for determining whether an EIS is needed." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 37 (D.C. Cir. 2015) (internal quotations omitted). If the agency, after issuing an EA, concludes that there are no significant impacts and therefore an EIS is unnecessary, it must prepare a FONSI.

37.     However, if the EA reveals that the proposed action will or may significantly impact the human environment, an EIS must be prepared. This is because "an EA is intended to help an agency decide if an EIS is warranted; an EA is not meant to replace or substitute for an EIS." *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 872 (9th Cir. 2022).

**D.     <u>Regulations Issued by the Council on Environmental Quality</u>**

38.     NEPA also created the Council on Environmental Quality ("<u>CEQ</u>") within the Executive Office of the President to advise on environmental issues, including by "develop[ing] and recommend[ing] to the President national policies to foster and promote the improvement of

environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the [United States]." 42 U.S.C. §§ 4342, 4344.

39.    In 1970, President Nixon instructed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of" the "detailed statements" NEPA required. Exec. Order No. 11514, § 3(h), 35 Fed. Reg. 4247, 4248 (Mar. 7, 1970). In response, CEQ published a "memorandum" containing "guidelines" for federal agencies considering EISs. 36 Fed. Reg. 7724, 7724 (Apr. 23, 1971). Then, in 1977, President Carter issued an executive order instructing CEQ to issue "regulations" and ordering federal agencies to comply with those "regulations" unless doing so would violate federal law. Exec. Order No. 11991, 42 Fed. Reg. 26,967, 26,968 (May 25, 1977).

40.    Thereafter, CEQ issued a series of regulations that purport to "implement the requirements of NEPA." *See generally* 40 C.F.R. § 1500.1 *et seq.* (the "CEQ Regulations").

41.    Among other things, the CEQ Regulations establish levels of NEPA review (40 C.F.R. § 1501.3-.4); procedures for conducting EAs to determine whether an EIS is required (*id.* §§ 1501.5-.6); procedures for public and governmental engagement and deadlines (*id.* § 1501.10); requirements for EISs and comments on the same (*id.* §§ 1502.1-.24, 1503.1-.4); and record, implementation, and compliance procedures (*id.* §§ 1505.2-3, §§ 1507.1-.4).

42.    As discussed below, neither NEPA nor any other federal statute gives CEQ the authority to issue binding NEPA regulations for federal agencies.

**E.    The Administrative Procedure Act**

43.    Under the Administrative Procedure Act ("APA"), this Court must set aside and hold unlawful any agency action that is, among other things, "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law"; "in excess of statutory jurisdiction, authority, or limitations . . ."; or "without observance of procedure required by law." 5 U.S.C.

§ 706(2).

44.     An "[a]gency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider; entirely failed to consider an important aspect of the problem; offered an explanation for its decision that runs counter to the evidence before it; or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Am. Clinical Laboratory Ass'n v. Becerra*, 40 F.4th 616, 624 (D.C. Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)) (internal alterations and quotation marks omitted).

## FACTUAL BACKGROUND

### A.    Background on Plaintiff Lytton

45.     Plaintiff Lytton is a Southern Pomo Indian tribe based in Sonoma County, California. Lytton has over 300 adult members, and expects its membership to continue to grow in the future.

46.     In 1926, the federal government purchased land for homeless Indians in Sonoma County. This land would become the Lytton Rancheria, where Lytton members would settle and sustain themselves for decades.

47.     In 1961, the government illegally and unjustly terminated the Lytton Rancheria and ceased acknowledging Lytton as a federally recognized tribe pursuant to the California Rancheria Termination Act, Pub. L. No. 85–671, 72 Stat. 619 (1958) (as amended by Pub.L. No. 88–419, 78 Stat. 390 (1964)). However, after Lytton and other tribes brought a lawsuit against the federal government, *see Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924 (9th Cir. 1990) (the "Scotts Valley/Lytton Recognition Litigation"), the government reinstated its recognition of Lytton per the terms of a March 1991 stipulation entered into between

Lytton, the United States, and the County of Sonoma (where Lytton's aboriginal lands are located). The stipulation effectively prohibits Lytton from conducting gaming on the Lytton Rancheria or the Alexander Valley in Sonoma County.

48.    In 1999, Lytton applied to DOI for a restored lands determination. DOI rejected that application because it had a policy at the time of denying all restored land petitions absent legislation specifying that a tribe was entitled to certain lands.

49.    In 2001, pursuant to special federal legislation, the United States acquired a 9.5-acre site in San Pablo, California, to be held in trust for Lytton.[4] This legislation was necessary because the stipulation reinstating federal recognition of Lytton following the Scotts Valley/Lytton Recognition Litigation effectively prohibited Lytton from conducting gaming on its rancheria or in the Alexander Valley.

50.    Thereafter, Lytton converted an existing facility in San Pablo, California into a class II gaming facility—the San Pablo Lytton Casino. Lytton did so with support from local public officials, including the City of San Pablo and the City's Congressman. Lytton entered into multiple agreements with the City regarding the San Pablo Lytton Casino.

51.    Lytton continues to operate the San Pablo Lytton Casino as a Class II casino with approximately 1,580 electronically-assisted bingo devices. That casino contributes approximately 65% of the City's operating revenue.

52.    The San Pablo Lytton Casino has a customer base that draws largely from the North Bay region, including Solano County. The casino generates critical revenue that pays for Lytton's tribal needs, including health care, youth education, housing, and the purchase, development, and maintenance of property for Lytton's homeland. Moreover, as the employer of over 500

---

[4]    *See* Omnibus Indian Advancement Act of 2000, Pub.L. 106–568, Stat. 2868 (Dec. 27, 2000).

individuals, the San Pablo Lytton Casino is an economic pillar for nearby communities.

B.     **Background on Scotts Valley**

53.     Scotts Valley consists of the descendants of certain Pomo Indians whose ancestral territory is a rural area west of Clear Lake in Lake County, California.

54.     In 1911, the United States acquired a parcel of land for Scotts Valley known as the Sugar Bowl Rancheria, near Clear Lake. Scotts Valley held that land until 1958, when Congress enacted the California Rancheria Termination Act, which terminated the reservation status of the Sugar Bowl Rancheria as well as their tribal recognition.

55.     In 1991, Scotts Valley regained its status as a federally recognized tribe pursuant to the settlement of the same lawsuit that restored Lytton's tribal status. However, unlike Lytton, the federal recognition of Scotts Valley resulting from the Scotts Valley/Lytton Recognition Litigation did not restrict Scotts Valley's ability to conduct gaming on its former rancheria or within Lake County.

56.     Scotts Valley tribal operations are centered around Clear Lake. It owns multiple properties at and around Clear Lake, including a parcel it describes as its "tribal lands" where it hosts events and ceremonies. It also owns multiple businesses headquartered at Clear Lake, several of which have received state and federal grants to support activities at and around Clear Lake. And its primary tribal office is located in the town of Lakeport, on the western shore of Clear Lake.

57.     In 2005, Scotts Valley asked DOI to authorize a casino gaming project in Richmond, California under the restored lands exception. Richmond is in the San Francisco Bay area—over 100 miles away from Scotts Valley's historic homeland in Lake County. DOI rejected that application after it found that Scotts Valley lacked any "significant historical connection" to the site.

C.    **The Proposed Project**

58.    In 2016, Scotts Valley renewed its efforts to develop a San Francisco Bay casino by submitting an application for BIA to acquire a 128-acre parcel of land[5] into trust under the restored lands exception—this time in the Solano County city of Vallejo.

59.    The Project Site is located approximately sixteen miles from Lytton's trust land, including the San Pablo Lytton Casino, but is about 90 miles from Scotts Valley's tribal operations.

60.    The Project includes construction of a 614,000 square-foot, eight-story casino with restaurants, bars, and a ballroom for events. The Project also includes a hotel, twenty-four homes for tribal members, an administration building, and a biological preserve. Other supporting infrastructure, including proposed water treatment and wastewater treatment facilities, would also be located on the Project Site.

61.    The gaming component of the facility would be approximately 381,455 square feet. The hotel would be five stories tall and consist of 211 guest rooms and suites, food and beverage facilities, a spa and health club, retail, a reception and lobby, common areas, and recreation. Approximately 4,000 parking spaces would be provided on the ground floor of the casino, as well as in a three-story parking garage and an overflow surface parking lot (over 1,500,000 square feet in size).

62.    Scotts Valley's rendering of the proposed Project appears below:

---

[5]    As explained below, Scotts Valley requested that the Project Site be increased to 160 acres eight years later, in 2024.



### D.    2016 Application and Subsequent Litigation

63.    Scotts Valley's 2016 restored lands application sought to have DOI acquire 128 acres of land (of the 160 acres that ultimately made up the Project Site) in trust. The 2016 application claimed a significant historical connection to the land based on (a) an unratified treaty signed by some of the ancestors of some Scotts Valley members at Clear Lake in 1851 (the "1851 Unratified Treaty"); and (b) allegations that members' ancestors had been forced to labor on ranchos owned by the Vallejo family, which exercised official power over the North Bay region during the Mexican rule of California.

64.    In reality, however, Scotts Valley does not have a significant historical connection to Vallejo, just as it did not have one to Richmond. The Project is not located in or near Scotts Valley's aboriginal land. In fact, the Project Site is approximately 100 miles from Scotts Valley's original reservation near the town of Lakeport.

65.    Defendants previously recognized this fact—twice. First, DOI informed Scotts Valley in December 2016 that a favorable restored lands determination could not be granted

because Scotts Valley had not identified specific, positive evidence of a significant historical connection to Vallejo. Second, after allowing Scotts Valley to submit additional evidence, the Department again found no connection and declined the restored lands application in February 2019 ("The 2019 ILO").

66.     Even though the 2019 ILO was extensive in its review of the evidence and well-reasoned in its reliance on past decisions, Scotts Valley sued DOI challenging the 2019 ILO. Unsurprisingly, the district court concluded that BIA "did not overlook or ignore materials supplied by [Scotts Valley]; it considered them and supplied a rational connection between its assessment of those facts and its conclusions," and that its "findings cannot be said to be conclusory, unexplained, or unsupported." *Scotts Valley Band of Pomo Indians v. United States Dep't of the Interior*, 633 F. Supp. 3d 132, 140 (D.D.C. 2022).

67.     Nonetheless, the court remanded the case to DOI for consideration of whether the "Indian law canon of construction"—a principle of statutory interpretation applicable to certain legal issues where all tribal interests are aligned—should be applied in Scotts Valley's favor.

68.     Notably, however, the district court did *not* hold that BIA was required to reach a particular outcome, or even that it was required to apply the Indian canons of construction. Instead, on remand, BIA was required to use its own independent judgment to determine whether Scotts Valley qualified for the restored lands exception.

69.     Following the court ruling, Defendants embarked on a series of actions, more fully described below, that reversed decades of precedents and violated numerous procedural and substantive requirements.

E.       **Proceedings on Remand**

July 2024 Draft EA

70.       Following the 2019 ILO litigation, in July 2024, BIA published a draft EA (the "Draft EA") purporting to find that the Project will raise no significant environmental concerns, and setting a 30-day period in which to submit comments. The Notice of Availability for the Draft EA noted that a virtual public hearing would be held on July 23, 2024.

71.       The Draft EA was issued on a Friday night during a four-day 4th of July holiday weekend. Further, Lytton only learned of the Draft EA through other tribes.

72.       The Draft EA publicly revealed for the first time that the Project had been expanded to encompass 160 acres, not the 128 acres originally proposed by Scotts Valley in 2016.

73.       In time, Lytton came to learn that although Scotts Valley's 2016 application involved only 128 acres (the "Western Parcel"), Scotts Valley had subsequently submitted to BIA a letter *eight years later* seeking to include another 32 acres (the "Eastern Parcels") into the 2016 fee-to-trust application, making the Project a total of 160 acres. This letter, dated June 4, 2024, was not disclosed to the public, nor did it comply with various agency regulations.[6] BIA granted the request to amend the application, notwithstanding this delay.

74.       On July 24, 2024, after BIA provided a single 15-day extension to the deadline to provide comments, Lytton sent a letter to the Regional Director requesting an additional extension in light of the broad scope of released materials. Lytton also requested an opportunity to review Scotts Valley's application materials, and offered to do so at the BIA's regional office to help

---

[6]       For example, the letter failed to comply with Part 151 procedures, including the requirement to supply Defendants with title information regarding the Eastern Parcels. In fact, the letter suggested that Scotts Valley did *not* have title to the Eastern Parcels, as it merely informed Defendants that Scotts Valley had an opportunity to enter into a "letter of intent" to subsequently purchase the parcels.

facilitate the review process. Upon information and belief, Lytton did not receive a response to this request.

75.    Lytton also requested an additional public hearing on the Draft EA, noting that the hearing held by Defendants on July 23, 2024 over Zoom received little input from the members of the Vallejo and Solano County communities (other than from an overwhelming number of union carpenters who would be contracted to construct the Project) because it was insufficiently publicized. Indeed, unlike for similar projects, Defendants did not provide notice of the hearing in local newspapers or the Federal Register.

76.    However, no additional extension nor public hearing was ever held, and, upon information and belief, Defendants never responded to Lytton's request.

77.    Despite the compressed comment timeline, Lytton submitted comments on the Draft EA on August 16, 2024. The comments explained, for example, that the Draft EA improperly relied on mitigation measures and Best Management Practices ("BMPs")[7] that were vague, speculative, and/or unenforceable, and that the EA failed to address several glaring issues with the Project's water supply plans. Lytton received only cursory responses regarding the comments it submitted and, on information and belief, its comments were not seriously taken into account in the decision-making process. Indeed, the draft EA does not even list Lytton as a consulted organization.

78.    In addition, Lytton provided comments that Scotts Valley's application was incomplete, did not provide required information, and was procedurally improper. Lytton also explained that BIA failed to follow mandatory title review processes, that granting the application would cause serious jurisdictional problems and land use conflicts, and the application does not

---

[7]    BMPs describe methods of engaging in construction or other activities in a way that reduces and minimizes the potential adverse impacts of a proposed action.

withstand the "greater scrutiny" applicable to off-reservation trust acquisitions. Lytton did not receive a response to its comments, nor did Defendants incorporate its comments into its decision-making.

<u>Failed Consultation Process</u>

79.    On July 23, 2024, Lytton sent a letter to DOI to request consultation on 25 C.F.R. Part 292 and its application to California tribes that were reservation-shopping. Lytton suggested that the consultation be held in person on August 6, 2024 at Lytton's government offices. Lytton did not receive a response to this letter.

80.    Though BIA continued to decline to hold an in-person consultation with Lytton, BIA finally agreed to hold a Zoom meeting with Lytton. That Zoom meeting was scheduled for August 19, 2024. In advance of that meeting, Lytton sent a letter to BIA proposing discussion topics for the meeting, including regarding BIA's interpretation of the "significant historical connection" requirement under 25 C.F.R. § 292.12(b), as well as DOI's determination of whether Scotts Valley "has a significant historical connection to the location of their proposed project in Solano County." Lytton asked for a response by August 15, 2024. The Regional Director promised to respond after the PDAS-IA, Wizipan Garriott, had confirmed his agreement to the discussion topics—yet Garriott never did so and the Regional Director never responded.

81.    On August 16, 2024, Lytton cancelled the August 19, 2024 meeting because of BIA's failure to respond to its August 12 letter or otherwise propose topics for discussion. Lytton reiterated that it would welcome future consultation with approved topics and expressed hope that such future consultation would take place in-person.

82.    On September 20, 2024, Lytton, other tribes, and BIA—including then-Gaming Director Paula Hart and the Regional Director—held a group meeting to discuss the Project and

another project pending BIA approval. This meeting was ineffective, lacked substance, and was inconsistent with DOI's process for proper consultations, which are supposed to be "rooted in meaningful dialogue where the viewpoints of tribes and DOI, including its bureaus and offices, are shared, discussed, and analyzed."[8] Indeed, BIA characterized the meeting as a "technical assistance" meeting rather than a formal consultation. BIA spent much of the meeting describing its stances on various procedural matters. For example, Hart explained BIA's stance that non-applicant tribes such as Plaintiff lacked standing to challenge a BIA determination that Scotts Valley has a significant historical connection to the lands in question, and that BIA would apply the Indian canon of construction to evidence submitted by Scotts Valley but not to evidence submitted by non-applicant tribes. Also at this meeting, the Regional Director stated that although Plaintiff could not review the evidence provided by Scotts Valley in its application, Plaintiff and other tribes were permitted to submit new comments and evidence concerning the application. At the close of the meeting, Hart stated that a follow-up letter would be prepared that would outline the issues discussed. No such follow-up letter was ever sent.

83.     On November 22, 2024, Lytton received from the Office of Indian Gaming a form letter invitation to a group videoconference to discuss the Scotts Valley project on the afternoon of November 27—five days after the invitation was sent, and the day before Thanksgiving.

84.     In response, on November 22, 2024, Lytton explained that with such short notice and so close to the holidays it would not be able to join the call. Lytton further expressed its dismay at Defendants' clear attempt to engage in non-substantive "box-checking" exercises rather than legitimate attempts to obtain Lytton's input.

---

[8]     DOI Department Manual, 512 DM 5, *Procedures for Consultation with Indian Tribes*, available at https://www.doi.gov/sites/doi.gov/files/elips/documents/512-dm-5.pdf.

85.     On December 10, 2024, Lytton met with representatives of BIA and DOI, including the Regional Director, then-PDAS-IA Wizipan Garriott, and then-Gaming Director Paula Hart. At this meeting, Lytton expressed its significant concerns with the inadequate consultation process to date and numerous issues with the Draft EA. When asked about her promised follow-up letter, Hart stated that she had been busy but still planned to send it—yet she did not do so before leaving the position of Gaming Director in January 2025. The Regional Director, Garriott, and Hart subsequently ended the meeting abruptly because Garriott had another meeting scheduled. This 39-minute meeting was significantly shorter than the hour-long meeting promised to Lytton.

F.     **The January 2025 Approvals**

86.     On January 10, 2025, DOI issued a final decision (the "January 10 Decision") approving the Project. The January 10 Decision is a final agency action for purposes of the APA.

87.     The January 10 Decision included the 2025 ILO, which—contrary to the Defendants' 2019 decision—concluded that ancestors of Scotts Valley members occupied the vicinity of the Project Site and Scotts Valley satisfied all other requirements of the restored lands exception.

88.     The 2025 ILO stated that, "in reconsidering the 2019 ILO on remand, the Department neither solicited nor considered any additional evidentiary materials from outside parties, including [Scotts Valley] and those opposed to [Scotts Valley's] request." 2025 ILO at 3-4.

89.     When issuing the January 10, Decision, DOI also released the final EA (which was dated December 2024). Like the Draft EA, the final EA failed to list Lytton as a consulted organization, making clear that Lytton's extensive comments on the draft were not taken into account. The final EA contained many of the same errors as in the Draft EA, including that it

improperly relied on vague and speculative mitigation measures.

90.     The January 10 Decision also included a FONSI concluding that the Project's environmental consequences would be insignificant.

91.     The January 10 Decision also included a six-page section titled "Part 151 Analysis." The "Part 151 Analysis" did not address Lytton's comments on the Notice of Application. Moreover, the "Part 151 Analysis" purported to authorize a development significantly more extensive than any of the alternatives disclosed and evaluated in the EA.

### G.     The March 2025 Temporary and Partial Rescission of the 2025 ILO

92.     On March 27, 2025, DOI sent a letter to Scotts Valley notifying them that, pursuant to 43 C.F.R. § 4.5, DOI was temporarily rescinding its determination in the 2025 ILO that the Project site is eligible for gaming under the "restored lands" exception of the IGRA and associated regulations. On April 1, 2025, Scotts Valley filed suit to challenge this rescission and reinstate the 2025 gaming eligibility determination. *See Scotts Valley Band of Pomo Indians v. Burgum et al.*, Case No. 1:25-cv-00958-TNM (D.D.C.).

93.     However, that March 27, 2025 letter noted that DOI had not changed its determination that the Project Site could be taken into trust pursuant to the IRA and associated regulations, and that the Project Site would remain in trust. Likewise, that letter did not withdraw the EA, FONSI, or any other aspect of the January 10 Decision apart from Defendants' conclusion about the application of the "restored lands" exception.

### COUNT I

### (Violation of the APA, NEPA, and U.S. Constitution – Application of *Ultra Vires* CEQ Regulations)

94.     Plaintiff Lytton realleges and incorporates each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

95.     Lytton brings this cause of action under the Declaratory Relief Act and the APA to invalidate and void the January 10 Decision because the EA and FONSI for the Project relied on *ultra vires* CEQ Regulations inconsistent with NEPA.

96.     Defendants, in considering the environmental impact of the Project in the EA, applied and relied upon the CEQ Regulations. *See, e.g.,* EA at 1-1 ("To the extent that a court may conclude that the CEQ regulations implementing NEPA are not judicially enforceable or binding on this agency action, the BIA has nonetheless elected to follow those regulations at 40 C.F.R. Parts 1500-1508."); EA at 3-20 (applying "CEQ regulations" when assessing "indirect and growth-inducing effects" of the Project).

97.     However, "[n]o statute confers rulemaking authority on CEQ," and "CEQ had no lawful authority to promulgate these regulations." *Marin Audubon Soc'y v. Fed. Aviation Admin.*, 121 F.4th 902, 914 (D.C. Cir. 2024).[9] Likewise, DOI has not merely adopted the CEQ regulations or incorporated them by reference; rather, the purpose of DOI's own NEPA regulations is merely "for compliance with" CEQ regulations and to "supplement[], and . . . be used in conjunction with, the CEQA regulations." *Id.* at 914-15 (citing 43 C.F.R. §§ 46.10-20). Because the CEQ regulations are *ultra vires*, Defendants' reliance on those regulations is unlawful.

98.     The Court therefore should declare that Defendants' EA and FONSI for the Project are *ultra vires*, void, and invalid and cannot be enforced and implemented.

## COUNT II

### (Violation of IRA and APA –
### Failure to Comply with IRA Requirements)

99.     Plaintiff Lytton realleges and incorporates each of the allegations set forth in the

---

[9]     The mandate for this case has been stayed. *See* Order Granting Unopposed Motion to Stay Issuance of Mandate, *Marin Audubon Soc'y v. Fed. Aviation Admin.,* No. 23-1067 (D.C. Cir. Feb. 28, 2025).

foregoing paragraphs as if fully set forth herein.

100.    Lytton brings this cause of action under the APA to invalidate and vacate the January 10 Decision based upon Defendants' failure to follow requirements of the IRA and Part 151 regulations.

101.    The Part 151 regulations require BIA to ensure the applicant tribe has identified the purposes for which the proposed trust property would be used (25 C.F.R. §§ 151.10(c), 151.11(a)) and mandate that BIA ensure proper, marketable title consistent with the proposed use (25 C.F.R. § 151.13(b)). In the event that the agency "determines that the liens, encumbrances or infirmities make title to the land unmarketable," it "*shall* require elimination prior to such approval." 25 C.F.R. § 151.13 (emphasis added).

102.    Defendants approved a Project constituting 160 acres of land. As discussed above, although the ILO initially refers to a "128 acre" parcel of land in the body of the document, a footnote following that statement notes that "[Scotts Valley] subsequently updated its request, and the size of the Parcel is now 160.33 acres." 2025 ILO at 1 n.1.

103.    Scotts Valley's 2016 fee-to-trust application, however, only mentioned the 128-acre parcel of land—the Western Parcel—and failed to mention the existence of the Eastern Parcels of the Project Site at all, much less the Parcels' description, intended use, or other information. And even when Scotts Valley sent Defendants an informal letter regarding the Eastern Parcels eight years after its 2016 application, that letter failed to include required information about the Eastern Parcels, such as the parcels' intended use, tax information, and business plans. *See* 25 C.F.R. § 151.11.

104.    Despite the absence of this information that the Secretary must consider when evaluating a land-into-trust application, Defendants took the entire 160 acres of land into trust.

105.    Further, the approved Project conflicts with easements and rights-of-way legally limiting permissible uses of the Project Site. As Lytton informed Defendants, the Western Parcel of the Project Site is subject to, *inter alia*: (a) an easement for a City of Vallejo water line, which prohibits "erect[ing] or construct[ing] any building or other structure or improvements" on the land; and (b) multiple easements for high-voltage transmission lines. A preliminary title report of the Eastern Parcels showed that they were subject to various encumbrances as well.

106.    Upon notice of the unmarketable title of the Project Site, Defendants were required to mandate "elimination [of the encumbrances] prior to approval." 25 C.F.R. § 151.13. Defendants failed to do so.

107.    Part 151 also requires consideration of the distance between the applicant tribe's existing lands and the proposed trust property, with "greater scrutiny to the tribe's justification of anticipated benefits from the acquisition," and "greater weight to the concerns raised" by state and local governments as that distance increases. 25 C.F.R. § 151.11(b).

108.    Defendants admitted that the Project Site is distant from Scotts Valley's aboriginal lands, prior reservation, and current properties, but they nonetheless failed to apply "greater scrutiny" to Scotts Valley's claimed anticipated benefits from the Project. Instead, they simply stated: "The Department's review of [Scotts Valley's] application found that acquisition of the Vallejo Site in trust is necessary to facilitate Tribal self-determination and economic development . . . [Scotts Valley] needs an economic driver to generate funds to provide much-needed housing for its members and governmental facilities. Therefore, the acquisition satisfies the condition in 25 C.F.R. § 151.3(a)(3)." This cursory analysis fails the "greater scrutiny" test.

109.    Moreover, Defendants failed to give "greater weight"—really, any weight—to the concerns raised by Lytton. Although Defendants listed Lytton as an "interested part[y]" and Lytton

submitted an extensive analysis of Scotts Valley's failure to comply with Part 151, Defendants failed to mention input by Lytton at all.

110.    Finally, the Part 151 regulations require BIA to carefully evaluate "jurisdictional conflicts" and "potential conflicts of land use which may arise." 25 C.F.R. §§ 151.10(f), 151.11(a), (d).

111.    As Lytton informed Defendants in its December 2024 letter, the portion of the parcel on which Scotts Valley has proposed to develop a 600,000 square-foot casino is currently set aside as open space under both the Vallejo General Plan and applicable zoning regulations in recognition of its sensitive ecological features.

112.    BIA acknowledged that "the proposed uses of the Vallejo Site are not consistent with the allowable uses under the existing zoning code," but nonetheless determined this was not a problem because "once acquired in trust status, the Vallejo Site will no longer be under the jurisdiction of the city, and thus, the policies and land use regulations of the City of Vallejo would no longer apply."

113.    This statement is only further proof of Defendants' predetermined decision-making. Rather than give "greater weight" to the conflicting concerns of local governments and their plans for land use as required by Part 151, Defendants' predetermination that it would approve the Project impermissibly and unlawfully rendered this Part 151 factor irrelevant.

114.    For the reasons above, Defendants' decision to approve the Project was arbitrary, capricious, an abuse of discretion, and contrary to the IRA and the Part 151 regulations.

## COUNT III

### (Violation of NEPA and APA –
### Failure to Consult)

115.    Plaintiff Lytton realleges and incorporates each of the allegations set forth in the

foregoing paragraphs as if fully set forth herein.

116.    Lytton brings this cause of action under the APA to invalidate and vacate the January 10 Decision for the Project based upon Defendants' failure to consult, as required by the NEPA and associated regulations.

117.    Defendants' NEPA regulations require the agency to "whenever possible consult, coordinate, and cooperate with relevant State, local, and tribal governments and other bureaus and Federal agencies concerning the environmental effects of any Federal action within the jurisdictions or related to the interests of these entities." 43 C.F.R. § 46.155; 40 C.F.R. § 1501.5(f) ("Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments."); *cf.* 40 C.F.R. § 1501.2(b)(4)(ii) (requiring that agency "consult[ ] early with appropriate State, Tribal, and local governments and with interested persons and organizations when their involvement is reasonably foreseeable.")

118.    And Defendants' NEPA guidance specifies that when BIA determines that tribes could be affected by a proposed action, they should be "consulted during the preparation of environmental documents and, at their option, may cooperate in the review or preparation of such documents." *Interior NEPA Manual* § 10.3.A(2)(a). Thus, an agency must engage in early and meaningful consultation with affected tribes when practicable.

119.    The Draft and final EAs expressly acknowledged that Lytton's casino would be adversely affected by the Project. Specifically, the EAs anticipated that the Project would cause the San Pablo Lytton Casino to experience a reduction of over 20% in annual gaming revenues due to its close proximity to the casino.

120.    Despite the Project's serious impact on Lytton, Defendants failed to consult with

Lytton in the preparation of the EAs—as Defendants concede, having not identified Lytton as one of the consulted organizations in either the Draft or final EA.

121.    Defendants failed to consult with Lytton despite Lytton's multiple submissions to Defendants regarding the inadequacy of the EA and requests to cooperate in the preparation of such materials. Defendants did not meaningfully respond to Lytton's comments. Nor did they otherwise revise the EA to incorporate any of Lytton's concerns.

122.    As a result of Defendants' refusal to consult, cooperate, or account for Lytton's concerns, the EA presents erroneous and misleading information about the Project and its impacts. For example, the EA's economic studies include individualized statistics for multiple Bay Area counties—including Alameda, Contra Costa, San Francisco, and San Mateo Counties—but inexplicably group Sonoma, Marin, and Napa counties together for purposes of the same statistics. EA App. A at 13. This creates an inaccurate picture of the household income, employment, population, and gaming revenue in those three counties.

123.    From the outset of the Project, it was practicable for Defendants to meet and communicate with Lytton about its impact on the tribe. Upon information and belief, Defendants' failure to meaningfully consult arose from their goal of approving the Project before the end of the Biden administration—regardless of whether Lytton would have any meaningful opportunity to consult on the Project.

124.    Defendants' January 10 Decision without meaningful and early consultation with Lytton violates NEPA and the APA.

125.    Therefore, the Court should void and invalidate the January 10 Decision.

## COUNT IV

**(Violation of APA and NEPA –
Failure to Provide the Public with the Opportunity for Meaningful Review)**

126.    Plaintiff Lytton realleges and incorporates each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

127.    Lytton brings this cause of action under the APA to invalidate and void the January 10 Decision based upon Defendants' failure to provide the public with a meaningful opportunity to comment on the Project.

128.    To the extent the CEQ Regulations are valid, they require that agencies "identify, consider, and disclose to the public relevant environmental information early in the process before decisions are made and before actions are taken." 40 C.F.R. § 1500.1(b). "Public disclosure and involvement is a key requirement of NEPA." *See* Dept. of the Interior, *Indian Affairs NEPA Guidebook* § 2.1 (Aug. 2012).

129.    Despite these requirements, Defendants have consistently failed to provide public comment periods commensurate with the length and complexity of materials released for the Project, which collectively comprised of thousands of pages.

130.    Defendants gave the public only 45 days to comment on the Draft EA, which was issued on July 8, 2024.

131.    There was no official notice of the Draft EA in the federal register, local newspapers, or elsewhere. Lytton learned about the Draft EA from other tribes.

132.    In addition, Lytton expressed numerous times to Defendants that the public hearing on the Draft EA held via Zoom on July 23, 2024 did not include members of the affected communities because it was not properly publicized. Lytton requested another public hearing and expressed its concern that BIA "view[ed] this process as a mere formality." Lytton received an

email response from Chad Broussard, the BIA's environmental specialist, declining to hold an additional hearing.

133.    Upon information and belief, Defendants' refusal to provide a reasonable extension of the comment period for the Draft EA, and to even publicize its issuance, arose from their goal of approving the Project before the end of the Biden administration—regardless of whether Lytton or any member of the public would have any meaningful opportunity to review the Project. The failure to provide a reasonable amount of time for public review and comment was due to the predetermined decision-making. Instead of ensuring that their environmental studies appropriately evaluated the Project's significant impacts, including by conducting an unbiased analysis that considered the information provided by the public, including Lytton, Defendants limited the time periods to ensure approval before the end of outgoing officials' terms.

134.    The limited time permitted for public comment, coupled with the increasing volume and complexity of materials provided in the Draft EA meant that commenters were not provided an opportunity to fully and meaningfully review the Draft EA and its appendices. As a result, Defendants were unable to engage in a meaningful dialogue with the public, as NEPA requires.

135.    Defendants' failure to afford public commenters with a meaningful opportunity to engage in dialogue regarding the Project renders its EA inadequate under NEPA.

136.    Therefore, the Court should void and invalidate the January 10 Decision.

<u>**COUNT V**</u>

**(Violation of NEPA and APA –
Failure to Take a Hard Look at Environmental Impacts)**

137.    Plaintiff Lytton realleges and incorporate each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

138.    Lytton brings this cause of action under the APA to invalidate and void the January

10 Decision based upon Defendants' rescission of the prior determination regarding the application of the "restored lands" exception for the Project Site, and/or Defendants' failure to comply with NEPA when issuing the EA and FONSI.

139.    Preliminarily, the EA and FONSI purport to examine the potential environmental impacts of the proposed casino facility on the Project Site. But Defendants have temporarily rescinded their determination that the "restored lands" exception of IGRA applies—and the EA and FONSI therefore consider a Project that could not be built. Unless and until Defendants reinstate their determination that the "restored lands" exception applies to the Project Site, the analyses in the EA and FONSI are invalid and void for that reason alone.

140.    In any event, even if Defendants reinstated their determination that the "restored lands" exception applies to the Project Site, the EA and FONSI violate NEPA and APA.

141.    NEPA requires that agencies "have available, and . . . carefully consider, detailed information concerning significant environmental impacts." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Taking a "hard look" includes "considering all foreseeable direct and indirect impacts." *Center for Biological Diversity v. Salazar*, 695 F.3d 893, 916-17 (9th Cir. 2012). It also requires agencies to "address or refute" concerns presented in comments.

142.    Defendants, in issuing the EA and FONSI, purport to have considered all potentially significant environmental impacts and comments, concluding that "the Proposed Action is not a federal action that would result in significant adverse effects to the quality of the human environment with mitigation." Based on this analysis, Defendants concluded that an EIS was not necessary and moved forward with the Project.

143.    However, the EA fails to adequately respond to and consider comments from Lytton regarding various significant impacts.

144.    Moreover, to the extent that the EA does identify and consider some of these impacts on Lytton, its conclusion that the impacts would be "less than significant" based on mitigation measures and BMPs is not supported by the record contained in the EA. For example, the mitigation plans proposed by Defendants are speculative, unenforceable, and based on hypothetical actions taken by third parties.

145.    Altogether, the EA fails to justify its conclusion that an EIS—which would have included a more substantial environmental review, a closer comparison of alternatives, and greater public engagement—is not necessary.

146.    As discussed in greater detail below, Defendants' failure to "take a hard look" at all potentially significant environmental impacts, adequately address Lytton's comments, or show that the recommended mitigation measures and BMPs would be enforceable and actionable constitutes a violation of NEPA and the APA.

<u>Proposed Mitigation Measures and BMPs Are Unenforceable and Speculative</u>

147.    Defendants' conclusion that the Project is not a major action with significant environmental impacts rested on its determination that Scotts Valley will mitigate potential impacts. *See* FONSI at 1; EA at 4-1. As BIA itself acknowledges, "[a]ny mitigation measure must be enforceable[,] and it is important for BIA Regional and Agency Offices to establish monitoring programs to ensure that mitigation is carried out." *Indian Affairs NEPA Guidebook* § 6.4.6 (Aug. 2012). However, many of the mitigation measures and BMPs proposed in the EA are speculative and facially unenforceable, for several reasons.

148.    First, BIA or other relevant federal agencies must have the ability to enforce the relevant mitigation measures or BMPs. If "agencies lack the power to guarantee the improvements in question," then "the proper course is to exclude them from the analysis and consider only those

actions that are in fact under agency control or otherwise reasonably certain to occur." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 936 n.17 (9th Cir. 2008); *see also Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1090 (N.D. Cal. 2016*) (agency's reliance on a mitigation measure that was "not under [the agency's] control" constituted a violation of the APA). Several of the mitigation measures and BMPs contemplated in the EA are not enforceable by BIA and/or are otherwise outside of Defendants' control because they rely on a threshold determination by Scotts Valley or another third party that adverse impacts will occur or have already occurred.

149.    For example, in proposing mitigation related to water contamination, the EA states that a 404 permit and 401 certification under the Clean Water Act shall be obtained "*[i]f impacts to waters of the U.S. and wetland habitat are unavoidable*." EA at 4-2. The implementation of this mitigation measure relies on Scotts Valley's determination, *after* construction has already commenced, that impact to U.S. waters is "unavoidable." The EA also contains mitigation plans that rely on a third party's willingness to enter into agreements with Scotts Valley. *See, e.g.,* EA at 4-9 (requiring that Scotts Valley "negotiate an Intergovernmental Service Agreement with the City of Vallejo" and "negotiate a service agreement with the [Vallejo Flood and Wastewater District]" to minimize impacts to public services and utilities). Defendants could not have analyzed the Project's potential environmental impacts when the proposed mitigation measures are vague directives and future plans outside BIA's control that are contingent on potential actions by third parties.

150.    As another example, the EA describes a mitigation measure related to the preservation of cultural resources as follows: "In the event of any inadvertent discovery of prehistoric or historic archaeological resources during construction-related earth-moving

activities, all work within 50 feet of the find shall be halted until a professional [archaeologist or paleontologist] can assess the significance of the find in consultation with the BIA." EA at 4-7, 4-8. The EA then states that BIA will then "carry out appropriate actions" based on input from the State Historic Preservation Office, the Advisory Council on Historic Preservation, and "any Indian tribe that might attach religious and cultural significance to the affected property." EA at 4-8. Not only does this mitigation measure rely on Scotts Valley discovering (and reporting) that archaeological resources have been disrupted during the construction process, but it also fails to describe what specific steps will be taken to preserve the resource. It is simply impossible to assess the adequacy of such a mitigation measure.

151.    Similarly, various other proposed mitigation plans and BMPs state that certain actions shall be taken to the extent that they are "feasible" or "practicable." *E.g.,* EA at 2-17 ("[L]ow-flow toilets, faucets, and other water-suing appliances shall be installed *to the extent feasible*); 2-18 ("The use of low reactive organic gases . . . will be required for architectural coatings *to the extent practicable*); 4-19 (requiring the use of "environmentally preferable materials" "*to the extent readily available and economically practicable*"); 2-19 ("The Tribe will use clean fuel vehicles . . . in the vehicle fleet *where practicable*."); 4-1 ("Potential waters of the U.S. shall be avoided *to the extent feasible*."); 4-5 ("*To the maximum extent feasible*, the 25-foot buffer shall be maintained . . . ") (emphases added). Other mitigation plans merely require that Scotts Valley make "good faith efforts" to engage in the mitigation measure. *E.g.,* EA at 4-9 (in order to mitigate disruptions to public services and utilities, Scotts Valley "shall make good faith efforts" to enter into service agreements with local law enforcement and the Vallejo Fire Department). Such mitigation measures and BMPs do not guarantee that the proposed mitigation will actually occur if they merely require action that is "feasible" or based on "good faith efforts"

(ambiguous phrases which are not defined in the EA).

152.    In a similar vein, various of the EA's BMPs and mitigation measures rely on future reports, studies, permits, or plans which have not yet been drafted. For example, with respect to the preservation of land resources, the EA states that "[a] registered design professional will prepare a project-specific design-level geotechnical report," and "[a] corrective grading plan will be developed along with the design-level geotechnical study to clarify geotechnical recommendations." EA at 2-15. And regarding the protection of water resources, the EA states that a "Stormwater Pollution Prevention Plan (SWPPP) shall be prepared, implemented, and maintained throughout the construction phase of the development." EA at 2-16; *see also* EA at 4-9 ("[T]he Tribe shall fund the preparation of a study to be overseen and directed by [Vallejo Flood and Wastewater District] to determine any necessary infrastructure improvement to serve the project."). Other mitigation measures similarly depend on future, currently undrafted agreements with governmental entities. *E.g.,* EA at 4-9 (requiring that Scotts Valley "negotiate an Intergovernmental Service Agreement with the City of Vallejo" and "negotiate a service agreement with the [Vallejo Flood and Wastewater District]" to minimize impacts to public services and utilities).

153.    Because these reports, plans, and agreements *do not yet exist*, they necessarily cannot be analyzed for efficacy in protecting the threatened resource or minimizing the Project's adverse impact.

154.    Because the proposed mitigation and BMPs are vague and non-specific, and essentially constitute plans to develop mitigation plans at some unspecified point in the future, they cannot be meaningfully enforced as a practical matter.

155.    Moreover, this approach to mitigation means that Defendants have not taken a

"hard look" at the environmental impacts because the mitigation measures are too speculative and lacking in detail. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 734 (9th Cir. 2001) (noting that proposed mitigation measures must be "developed to a reasonable degree," and finding that the mitigation measures at issue were too uncertain and speculative to justify a finding of no significant impact).

156.    Finally, the mitigation measures and BMPs are ineffective because they rely on enforceability against Scotts Valley, a sovereign. Scotts Valley has not waived its sovereign immunity, as is necessary for enforceability of mitigation measures, and the applicable tribal law does not guarantee the mitigation measures' enforceability.

157.    In response to Lytton's concerns about the ability to enforce mitigation measures and BMPs against Scotts Valley, the EA claims that "the tribe has certified a resolution that the Tribe adopts and agrees to enforce, fund, and implement the mitigation measures." EA App. O at 3-99; *see* EA App. P. However, this resolution (attached to the EA as Appendix P) does not make the mitigation measures or BMPs enforceable against Scotts Valley. Lytton is not aware of, and the EA has not identified, any legal authority that would permit Defendants, Lytton, or any other third party to enforce Scotts Valley's resolution against Scotts Valley itself.

158.    The EA has not identified any Scotts Valley tribal ordinance or resolution granting the requisite waiver of sovereign immunity to permit enforcement actions by interested parties in a court of competent jurisdiction, and Scotts Valley's resolution does not guarantee that mitigation measures and BMPs would be enforceable against Scotts Valley. *C.f. Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387 (D.D.C. 2014), aff'd, 830 F.3d 552 (D.C. Cir. 2016) (agency reasonably assumed mitigation measures were enforceable when tribe had enacted an "irrevocable limited waiver of the Tribe's sovereign immunity . . . to allow an

enforcement action by the County"). Thus, the EA's reliance on such mitigation measures and BMPs is arbitrary and capricious.

159.    In sum, the mitigation measures and BMPs described in the EA are speculative and based on future contingencies. Taken together in the aggregate, these purported mitigation measures and BMPs introduce substantial uncertainty regarding the Project. Defendants could not possibly have taken a "hard look" at the environmental impacts of the Project given the hypothetical and uncertain nature of so many of the mitigation measures and BMPs.

Failure to Consider Impacts to Water Resources

*Speculative, Unenforceable, and/or Inadequate BMPs*

160.    The EA's analysis fails to adequately account for impacts to surface and groundwater resources to the extent that it relies on speculative, unenforceable, or inadequate BMPs.

161.    The EA acknowledges that "[i]mpacts to water resources would be significant if runoff from the Project Site causes localized flooding resulting in adverse environmental impacts or introduces additional contaminants to stormwater runoff that leaves the Project Site." EA at 3-10. The EA further notes that "[d]ischarges of pollutants, including grease, oil, fuel, and sediments, to surface waters from construction activities and accidents *are a potentially significant impact*," and states that it is "*conservatively assumed*" that the Proposed Project would "result in the *complete loss* of the 1.1 acres of marsh habitat." EA at 3-10, 3-11 (emphasis added).

162.    Despite the severity of these potential environmental impacts, the EA does not contain any stormwater analysis or modeling that shows how much water will run onto the Project Site, where the water will run onto the Project Site, and where the water will discharge from the Project Site.

163.    Worse, the EA relies upon assumed future—and therefore highly speculative—actions to be taken not only by Scotts Valley, but by other third parties, to mitigate these acknowledged risks and support its overall finding of no significant impact to water resources.

164.    For example, the EA claims that "[w]ith adherence to the [National Pollutant Discharge Elimination System (NPDES)] permitting program and implementation of the [Stormwater Pollution Prevention Plan (SWPPP)]," any impact to surface water would be "less than significant." EA at 3-10 and 3-11. The EA similarly finds that "[g]roundwater quality would not be adversely affected" by the Project because "the Tribe would comply with the NPDES General Construction Permit," including by implementing a "site-specific SWPPP." EA at 3-12.

165.    However, Scotts Valley has not yet obtained coverage under the NPDES General Construction Permit, nor has it prepared the requisite SWPPPs.

166.    Defendants cannot rely on Scotts Valley's hypothetical, future coverage under the NPDES permitting program to conclude that the impacts to surface water and groundwater will be "less than significant."

167.    Likewise, Defendants have not (and cannot) evaluate Scotts Valley's theoretical SWPPP in order to confirm its adequacy to render the impact on surface water and groundwater "less than significant," as the SWPPP does not yet exist.

168.    In order to reach a valid conclusion regarding the impact of the Project on surface water and groundwater supplies, Defendants must: (i) require Scotts Valley to prepare the requisite SWPPP, and (ii) conduct an environmental review of the SWPPP. The EA's reliance on speculative future actions and Scotts Valley's promises is not a hard look at environmental impacts under NEPA. *See, e.g.*, *Friends of Animals v. U.S. Fish & Wildlife Svc.*, 28 F.4th 19, 34 (9th Cir. 2022).

169.    The EA also claims that "BMPs would reduce the potential impacts to groundwater quality during construction." EA at 3-13. Again, however, the EA offers no method of ensuring that the BMPs are actually enforced against Scotts Valley, a sovereign. Indeed, the EA characterizes the BMPs as "*voluntary* measures that would be implemented by [Scotts Valley]." EA at 2-15 (emphasis added).

170.    And in any case, many of the referenced BMPs contain vague directives or noncommittal plans to develop more detailed plans in the future, which cannot be meaningfully enforced. For example, the EA states that "[c]onstruction activities shall be scheduled to minimize land disturbance during peak runoff periods to the extent feasible," without clarifying what it means to "minimize" such disturbances "to the extent feasible." EA at 2-16. Another BMP states that "[a] spill prevention and countermeasure plan shall be developed" to prevent contamination by potential pollutants on the Project Site. EA at 2-16. Not only does the EA fail to provide any detailed requirements of any such "spill prevention" plan, but it also fails to assess any resulting plan (as the plan does not yet exist). It is arbitrary and capricious for BIA to rely on such vague, ill-defined BMPs to conclude that the potential impacts on water resources will be less than significant.

*Failure to Adequately Consider Water Supply and Wastewater Concerns*

171.    The EA fails to address or resolve various critical issues regarding the Project's water supply and wastewater treatment and disposal.

172.    First, in finding that there are no adverse effects on water resources, the EA relies on a July 2024 Water and Wastewater Feasibility Study (the "Water Feasibility Study"). *See* EA, App. B. This Water Feasibility Study, however, expresses uncertainty with respect to a number of key variables related to water supply and notes that there are "several water supply limitations

identified at the Project Site *that require further investigation*." *Id.* at 6-1 (emphasis added). Specifically, the Water Feasibility Study anticipates that the Project will require a "connection to the City's municipal water supply system" and "the construction of an on-site water storage tank and pump station." *Id.* The study further notes that the configuration of these facilities depends on the feasibility of constructing the water storage tank "at a high enough elevation to provide pressure to the system." *Id.*

173.    The EA, however, fails to address—much less resolve—these water supply limitations. On information and belief, Scotts Valley has not entered into an agreement with Vallejo that would permit the Project Site to connect to the City's municipal water supply system. Further, the EA does not analyze the feasibility of constructing a water tank at the required elevation, despite the Water Feasibility Study's determination that the feasibility of this tank construction will determine the configuration of these water supply facilities (which are vital to the Project's viability). In other words, the EA fails entirely to engage in the "further investigation" that the Water Feasibility Study notes is necessary in order to fully understand the Project's impact on water supply. *See* EA, App. B at 6-1.

174.    Second, the EA fails to adequately consider the impacts and challenges of its water supply options. The EA notes that water supply for the Project may require a municipal connection, which in turn would require the City of Vallejo's approval of pipeline easements for the installation of recycled water pipelines. EA at 1-8. The approval of these easements is by no means assured or even likely, yet the EA fails to consider: (i) how water supply might be impacted if such easements are not granted, or (ii) the impact of building such pipelines.

175.    The EA's proposed alternative for water supply—on-site groundwater supply, rather than a municipal connection—is so lacking in information collected and analyzed that this

alternative option is illusory. With respect to the option of pursuing on-site groundwater supply, the Water Feasibility Study states: "The hydrogeologic assessment did not identify any groundwater wells within a half mile vicinity of the project site and no history of pump tests on or near the site were available to speak to the availability of groundwater," and "thus the potential yield is currently unknown." EA, App. B at 4-1. Thus, the EA has no basis whatsoever to believe that its alternative option for groundwater supply is feasible at all—making it all the more worrisome that the EA fails to adequately address potential issues with acquiring easements to establish a connection to the municipal water supply. This failure to adequately consider "relevant and reasonable alternatives . . . violates the 'hard look' requirement." *Flaherty v. Bryson*, 850 F. Supp. 2d 38, 72 (D.D.C. 2012).

176.    Third, the EA fails to consider concerns regarding the location of water and wastewater infrastructure. The EA assumes that water storage tanks and related infrastructure will be located in the "utility area" in the southern portion of the Project Site. EA at 2-8; *see also* EA at 2-2 (map showing the overall Project Site and "utility area" contained therein). However, this "utility area" is located *at the site of an existing landslide. See* EA at 2-12 (map showing "Landslide #4" at the site of the "public utility area" where water tanks are proposed to be placed). The EA does not discuss potential environmental impacts from that placement. Moreover, because of these critical physical limitations, the water tanks' ultimate placement likely will be a location other than "utility area." Because it analyzes impacts in a location in which the tanks ultimately will not be placed, the EA fails to take a "hard look" at environmental impacts of those tanks.

177.    Finally, the EA presumes the "[p]roper treatment and removal of wastewater" under both water supply options, and deduces that there will be "no potential adverse impacts" based on this presumption. EA at 3-13. However, the EA fails to provide any documentation or support for

this presumption of proper treatment and removal. In fact, the Water Feasibility Study indicates that the mechanism for the treatment and removal of wastewater is not yet determined; the study states that if a municipal water supply connection is not obtained, Scotts Valley "should maximize the onsite recycling of wastewater and seek off-site disposal options in partnership with the City and District." EA, App. B at 6-1. It is improper for Defendants to conclude that the proper treatment and disposal of wastewater is feasible, much less that there are no potential adverse impacts, when the EA itself acknowledges that the treatment and disposal mechanisms are undecided.

<u>Failure to Adequately Consider Economic and Market Impacts</u>

178.    Finally, the EA improperly bases its analysis of economic and market impacts on deficient socioeconomic studies.

179.    In concluding that the Project would result in "generally beneficial socioeconomic effects" (EA at 3-118), the EA relies on the Scotts Valley Market Study, Economic Impact Study, and Community and Social Impact Study (the "<u>Socioeconomic Study</u>") (attached to the EA as Appendix A). However, the Socioeconomic Study contains several deficiencies, rendering the EA's analysis of socioeconomic impact insufficient.

180.    First, the Socioeconomic Study presents a skewed picture of certain socioeconomic data by inconsistently grouping certain counties together. The Socioeconomic Study presents individualized statistics for multiple Bay Area counties, including Alameda County, Contra Costa County, San Francisco County, and others. EA, App. A at 13. However, the study—without any explanation—presents statistics for Napa County, Sonoma County, and Marin County grouped together as a single unit. *Id.* It similarly combines Sacramento County and San Joaquin County for these statistics. *Id.* In doing so, the Socioeconomic Study presents a skewed picture of the Project's

impact on household income, employment, population, and gaming revenue in these counties.

181.    Additionally, the Socioeconomic Study and EA conspicuously fail to address employment impacts. Businesses near the Project are presently struggling to find service workers, to the point that many businesses have been forced to close. The Project likely will exacerbate this problem—yet the EA does not substantively analyze this impact. Likewise, the unemployment rate in Lake County (where Scotts Valley's homelands are located) is much higher, so the residents of Lake County would almost certainly enjoy a greater benefit than the residents of Solano County from the jobs the Project would bring, yet the EA does not analyze this point.

182.    Nor does the Socioeconomic Study adequately analyze the Project's impact on the San Pablo Lytton Casino, the City of San Pablo, or Lytton's tribal members. To start, the EA does not offer an analysis of how the Project's offering of Class III gaming might negatively impact the San Pablo Lytton Casino, which only offers Class II gaming. The EA and its Socioeconomic Study also do not take into account or discuss how California's population decline or monetary inflation—trends that have been observed in recent years and are likely to continue in the future—might influence the Project's impact on Lytton's casino.

183.    Further, the EA predicts that, as a result of the Project, the San Pablo Lytton Casino will lose 21% of its revenue, and will take nearly 8 years to recover from this adverse impact. Yet the impact of this revenue loss on Lytton's members and community is not discussed in any meaningful way. Lytton depends on revenue from its casino to provide housing for its elders, education for its youth, and healthcare services for all of its members. The EA contains no analysis of how, specifically, this revenue loss would impact the lives of Lytton's members in the 8 years following the Project's construction, or how Lytton might consider planning for or making up for such losses.

184.    Finally, any economic impacts to Lytton's casino will necessarily impact the residents of the City of San Pablo, as the San Pablo Lytton Casino provides 65% of the City's budget. Yet the EA does not meaningfully discuss the effects that the projected loss of revenue will have on San Pablo, its citizens, or the surrounding area.

185.    Accordingly, even if Defendants reach a new determination that the "restored lands" exception applies to the Project Site, Defendants' failure to issue an EIS and its woefully inadequate analysis in the EA therefore constitutes a violation of NEPA and the APA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Lytton respectfully requests that the Court:

A.    Vacate and remand the January 10 Decision;

B.    Issue preliminary and permanent injunctive relief and any other orders necessary to preserve the parties' rights and status pending conclusion of the review proceedings;

C.    Award Lytton its costs and litigation expenses, including attorneys' fees and costs; and

D.    Award Lytton such other and further relief as the Court deems just, proper, and equitable.

Dated: April 10, 2025                    MAYER BROWN LLP


By:  */s/ Andrew J. Pincus*
      Andrew J. Pincus
      *apincus@mayerbrown.com*
      1999 K Street, NW
      Washington, DC 20006-1101
      Telephone:  (202) 263-3000

      Daniel D. Queen (*pro hac vice to be submitted*)
      *dqueen@mayerbrown.com*
      Carter M. Jansen (*pro hac vice to be submitted*)
      *cjansen@mayerbrown.com*
      333 South Grand Avenue, 47th Floor
      Los Angeles, CA 90071
      Telephone:  (213) 229-9500
      Facsimile:  (213) 625-0248

      Avi M. Kupfer (*pro hac vice to be submitted*)
      *akupfer@mayerbrown.com*
      71 South Wacker Drive
      Chicago, IL 60606
      Telephone: (312) 701-8330


      *Counsel for Plaintiff Lytton Rancheria of California*